921 So.2d 165 (2005)
John MURDEN, Sr. and Josephine Musso Murden
v.
ACANDS, INC.; Asbestos Claims Management Corporation (Formerly Known as National Gypsum Company); Babcock & Wilcox Company; Branton Insulations, Inc.; Champion International Corporation (Formerly U.S. Plywood Corporation), et al.
John Murden, Sr. and Josephine Musso Murden
v.
Champion International Corporation and U.S. Plywood Corporation, et al.
Nos. 2005-CA-0319, 2004-C-2122.
Court of Appeal of Louisiana, Fourth Circuit.
December 14, 2005.
*166 Robert E. Peyton, Elizabeth S. Cordes, Christovich & Kearney, L.L.P., New Orleans, LA, Phil B. Abernethy, Butler, Snow, O'Mara, Stevens, etc., Jackson, MS, Counsel for Champion International Corporation and U.S. Plywood Corporation.
Derek A. Walker, Parker Harrison, Chaffe McCall L.L.P., New Orleans, LA, Counsel for AXA Belgium, N.V.
(Court Composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge, MAX N. TOBIAS, JR., and Judge DAVID S. GORBATY).
MAX N. TOBIAS, JR., Judge.
In this consolidated matter, third-party defendant, AXA Belgium N.V. ("AXA"), appeals a partial summary judgment in favor of defendants/third-party plaintiffs, Champion International Corporation and U.S. Plywood Corporation (collectively "Champion").[1] After reviewing the record and applicable law, we affirm the judgment of the trial court in favor of Champion and deny the writ filed by AXA.
*167 The surviving family members of plaintiff, John Murden, filed suit against Champion, alleging that Mr. Murden died as a result of his exposure to asbestos-containing materials, including those manufactured, sold and/or distributed by Champion or its predecessors. The plaintiffs further alleged that Mr. Murden's exposures occurred while he was employed by two different companies in Louisiana between 1960 and 1974. Champion filed a third-party petition for indemnity and/or contribution against Euro Panels Overseas N.V., the successor corporation to Eternit N.V. (collectively "Eternit"), the company that manufactured several of the products allegedly sold by Champion, and against AXA, as the insurer of Eternit and Champion.
AXA filed exceptions of lack of personal jurisdiction and no cause of action that were overruled by the trial court in June 2003. AXA answered Champion's third-party demand, denying its claims for defense and indemnity. Champion later settled with the plaintiffs and all claims against Champion were dismissed, reserving its rights against Eternit and AXA.
Champion filed a motion for partial summary judgment on the basis that under Louisiana law, the policy issued by AXA provides insurance coverage to Champion for the claims asserted against it by the plaintiffs. A few months later, AXA filed its own motion for partial summary judgment arguing that under Belgian law, the policy does not provide insurance coverage for the same claims. The insurance contract at issue does not contain a choice of law provision.
The trial court held that Louisiana law should be applied to the insurance contract and, under Louisiana law, coverage exists. Thus, Champion's motion was granted and AXA's motion was denied.
Champion was the distributor of Eternit products in the United States from 1958 to 1974. The products distributed included wallboard products, which allegedly contained asbestos and to which Mr. Murden was exposed. When Champion's distribution of Eternit's products ceased, the termination agreement between Champion and Eternit specifically required Eternit to purchase insurance for Champion.
AXA's predecessor, Caisse Patronale S. A., issued an insurance policy to Eternit that provided products liability insurance.[2] In Section I. "Object and Scope of the Insurance," the policy provides as follows:
The object of the insurance is to cover the contractual or non-contractual statutory liability which may be incumbent upon the Subscriber [Eternit] as a result of bodily injuries and/or damage to property accidentally caused third parties by a supply delivered by the Subscriber to its sole distributors in the USA and Canada.
The insurance is payable in case of accidental damage resulting, in particular, from defects or faults in the supplies, as well as errors, faults or negligence in design, manufacture, packing, packaging, labeling, shipping, etc.
There are covered in particular actions brought against the Subscriber on the basis of Article 1645 of the Civil Code or of similar provision in law in force in the USA and Canada in case of accidental damage resulting from hidden defects or faults of which the Subscriber or its employees would be presumed to have had knowledge, only cases of willful misconduct or fraud established on the *168 part of the Subscriber itself being excluded.
* * *
The insurance covers all losses which have occurred during the term of the contract, whatever the period of time which has passed since the delivery of the supplies.
Losses which have occurred after the expiration, cancellation or voiding of the policy for any reason whatsoever are not covered by the policy.
Under the Special Conditions section of the policy, Champion was made an additional insured for the sale of Eternit's products.
Appellate courts review summary judgments de novo, using the same criteria applied by trial courts to determine whether summary judgment is appropriate. Reynolds v. Select Properties, Ltd., 93-1480, p. 2 (La.4/11/94), 634 So.2d 1180, 1182; Poree v. Elite Elevator Services, 98-0032, p. 1 (La.App. 4 Cir. 4/8/98), 711 So.2d 816, 817.
AXA's first assignment of error concerns the trial court's determination that Louisiana law would be applied to interpret the insurance contract at issue. AXA argues that applying Louisiana's choice-of-law principles to the policy and the parties would result in the application of Belgian substantive law.
Our choice-of-law provisions are set forth in the Civil Code, and provide guidance as to which states' law should apply. Relevant to choice-of-law issues in contract interpretation is La. C.C. art. 14 which provides:
Unless otherwise expressly provided by the law of this state, cases having contacts with other states are governed by the law selected in accordance with the provisions of Book IV of this Code.
Since we do not find any specific statutory choice-of-law rules applicable in this case, we examine the general choice-of-law rules set forth in the Code. Under La. C.C. art. 3515, the Louisiana conflicts of law provides:
Except as otherwise provided in this Book, an issue in a case having contacts with other states is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
That state is determined by evaluating the strength and pertinence of the relevant policies of all involved states in the light of: (1) the relationship of each state to the parties and the dispute; and (2) the policies and needs of the interstate and international systems, including the policies of upholding the justified expectations of parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state.
Of specific concern to Louisiana's conflicts-of-law provisions regarding conventional obligations, such as insurance contracts, is La. C.C. art. 3537 which reads:
Except as otherwise provided in this Title, an issue of conventional obligations is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue.
That state is determined by evaluating the strength and pertinence of the relevant policies of the involved states in the light of: (1) the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of domicile, habitual residence, or business of the parties; (2) the nature, type, and purpose of the contract; and (3) the policies referred *169 to in Article 3515, as well as the policies of facilitating the orderly planning of transactions, of promoting multi-state commercial intercourse, and of protecting one party from undue imposition by the other.
In Sentilles Optical Services, Div. of Senasco, Inc. v. Phillips, 26,594 (La.App. 2 Cir. 3/1/95), 651 So.2d 395, the court noted that:
Enforcement of a conventional obligation is governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue. La. C.C. Art. 3537. Article 3537 lists factors for determining the state whose law should be applied, incorporating the factors also listed in the more general La. C.C. Art. 3515. The two articles are intended to be read together. See La. C.C. Art. 3537, Comment (c). The objective of the articles is to "identify the state whose policies would most seriously be impaired if its laws were not applied to [the] issue [to be resolved]." La. C.C. Arts. 3515 and 3537. This objective is achieved through an issue-specific analysis of the policies of each of the two states, the first step in which process is to identify the relevant policies of the laws in two states.
Id. at pp. 4-5, 651 So.2d at 398.
In an analogous case, Shell Oil Co. v. Hollywood Marine, Inc., 97-106 (La.App. 5 Cir. 10/15/97), 701 So.2d 1038, the trial court found that Texas was the state whose policies would be most seriously impaired if its laws were not applied to the issues presented. More specifically, the trial court set forth the undisputed facts as follows:
The parties to the CGL policy are Hollywood, a Texas corporation with its principal place of business in Texas, and London underwriters. Trident Marine Managers, a Texas corporation with its principal place of business in Texas, acted on behalf of Hollywood in negotiating the terms of coverage and the premium. When coverage conditions were agreed to by London underwriters, Trident Marine Managers issued the policy evidencing coverage. The policy was delivered to Hollywood in Texas. The policy covers Hollywood's operations anywhere in the United States, including the Gulf of Mexico. Shell, an additional insured, is a Delaware Corporation with its principal place of business in Texas. Both Hollywood and Shell do business in Texas.
The contacts with Louisiana include the fact that Hollywood and Shell did business here and Manuel was injured in Louisiana. However, Manuel has no interest in which law applies since his judgment has been satisfied by Shell.
Id. at pp. 7-8, 701 So.2d at 1040-41.
Applying these facts to the relevant law, the trial court found that:
The type of contract involved here is an insurance contract. Texas clearly has a legitimate interest in regulating insurance contracts delivered to and insuring activities of Texas businesses. See Texas Ins.Code Ann. Art. 21.42 (1981). Louisiana has no such interest.
Id. at p. 8, 701 So.2d at 1041.
The appellate court agreed, stating:
Texas has a compelling interest is regulating insurance policies contracted for in Texas and issued to companies doing business in Texas. Although, the injury occurred in Louisiana, the injured party has been compensated and his judgment against Shell satisfied, and accordingly he has no interest in the outcome of this proceeding. Louisiana's interest arises only because a Delaware corporation, with its principal place of business in Texas, seeks indemnity under a policy *170 of insurance issued in Texas to recover payment it made to recompense for damages it caused to a Louisiana citizen. We do not believe that this interest is sufficient to override the compelling interest Texas has in regulating insurance contracts written in Texas and issued to Texas companies. Accordingly, we hold that Texas law should be applied in this instance.
Id. at p. 9, 701 So.2d at 1041.
A similar result was reached in the Third Circuit in the case of Halcomb v. Universal Insurance Co., 93-1424 (La. App. 3 Cir. 6/1/94), 640 So.2d 718, writ denied, 94-1740 (La.10/7/94), 644 So.2d 643. The case involved an automobile accident that occurred in Louisiana between Arkansas plaintiffs and Louisiana defendants. After settling with the defendants and their insurer, the Arkansas plaintiffs sought coverage for uninsured motorists under their own Arkansas policy. In finding that Arkansas law would be controlling in this instance, the court stated:
The action under consideration herein is likewise a matter of contract interpretation. The insurance policy herein was entered into between an Arkansas insurance company (Universal) and an Arkansas resident/domiciliary (Bradshaw) to provide coverage on a vehicle registered, titled and garaged in Arkansas. That policy is being sued on by other Arkansas residents/domiciliaries seeking coverage under that contract (policy) for damages they allegedly sustained. The only Louisiana contacts are the heretofore released tortfeasor and the site of the accident. Neither is relevant to the issues to be decided herein. No Louisiana resident or company is a party to this action; and, inasmuch as a complete release has been executed in favor of all Louisiana parties, the outcome of this action will not affect any policy or party in this state.
Id. at p. 7, 640 So.2d at 722.
See also Gill v. Matlack, 94-2546 (La. App. 1 Cir. 10/6/95), 671 So.2d 395; Levy v. Jackson, 612 So.2d 894 (La.App. 4 Cir. 1993); Resure, Inc. v. Chemical Distributors, Inc., 927 F.Supp. 190 (M.D.La.1996), aff'd, 114 F.3d 1184 (5 Cir.1997), cert. denied, 523 U.S. 1072, 118 S.Ct. 1511, 140 L.Ed.2d 665 (1998).
In Harrison v. R.R. Morrison & Son, Inc., 37,992 (La.App. 2 Cir. 12/10/03), 862 So.2d 1065, writ denied, 04-0101 (La.3/19/04), 869 So.2d 857, at issue was the law that should be applied to an insurance contract that contained a pollution exclusion. The court stated:
Federated Mutual argues that our court should apply Mississippi law and not Louisiana law in this case. We agree with Federated Mutual's argument and find that the law of the State of Mississippi would be most seriously impaired if its law was not applied in this case. The relationship of the State of Mississippi to each party is stronger than the relationship of the State of Louisiana to each party. The purpose of the insurance policy was to insure the assets and activities of a Mississippi corporation. R.R. Morrison is a Mississippi corporation that has its headquarters in Mississippi, its primary place of business is in Mississippi and an important fact to our court is that the insurance policy was negotiated and executed in Mississippi.
Further, the policies and needs of the interstate system, including the policies of upholding the justified expectations of the parties and of minimizing the adverse consequences that might follow from subjecting a party to the law of more than one state, weigh in favor of applying the law of the State of Mississippi. *171 The insurance policy insures R.R. Morrison's operations in a number of states, but both parties should have expected Mississippi law to apply, considering their strong contacts to that state. If we were to subject Federated Mutual to the laws of Louisiana, then adverse consequences could occur. The application of Louisiana law to the policy could result in the negation of a contract that Federated Mutual confected under the laws of another state.
In addition, the pertinent contacts of each state to the parties and the transaction, including the place of negotiation, formation, and performance of the contract, the location of the object of the contract, and the place of business of the parties, all favor applying the law of the State of Mississippi. As previously stated, the insurance policy was negotiated and formed in Mississippi. R.R. Morrison's primary place of business and headquarters is in the State of Mississippi. The performance of the contract included whatever states in which R.R. Morrison operated, but the State of Louisiana has no connection to the insurance policy other than the fact that it is one location among many that is considered the object of the contract.
Also, the nature, type and purpose of the insurance policy are in favor of applying the law of the State of Mississippi. Louisiana courts have often interpreted insurance policies according to the law of the state where the policy was issued. See Dreisel v. Metropolitan Property and Cas. Ins. Co., 01-2705 (La. App. 1st Cir.12/20/02), 836 So.2d 347, writ denied, 03-0199 (La.3/28/03), 840 So.2d 575; Montgomery v. Farmers Texas County Insurance Co., 34,628 (La.App. 2d Cir.5/9/01), 786 So.2d 306; Zuviceh v. Nationwide Ins. Co., 00-0773 (La.App. 1st Cir.5/11/01), 786 So.2d 340, writ denied, 01-2141 (La.11/9/01), 801 So.2d 373; Anderson v. Oliver, 97-1102 (La.App. 3d Cir.1/7/98), 705 So.2d 301, writ denied, 98-0755 (La.5/8/98), 718 So.2d 434; Shell Oil Company v. Hollywood Marine, Inc., 97-106 (La.App. 5th Cir.10/15/97), 701 So.2d 1038. Mississippi has a legitimate interest in regulating insurance policies executed in Mississippi, especially when an insurance policy is issued to a Mississippi business insuring all its activities. The purpose of the insurance policy in this case was to insure all the activities of R.R. Morrison, a Mississippi business. The integrity of an insurance policy is a substantial and real interest. Zuviceh, supra. The fact that Congress has allowed fifty states to have their own uniform system of regulations governing insurance strongly suggests that this is a legitimate public purpose. Id.

Id. at pp. 7-9, 862 So.2d at 1070.
In the instant case, we find that the pertinent contacts of Louisiana and Belgium to the parties and the transaction strongly favor the application of Belgian law to this coverage issue. The 1972 policy was negotiated and formed in Belgium. Eternit, the Belgian named insured, paid the insurance premiums in Belgium to Caisse Patronale, the Belgian insurer. The performance of the contract included whatever states in which Champion distributed Eternit's products. Louisiana has no particular connection to the insurance policy other than the fact that it is one location among many that could be considered the object of the contract since Eternit's products were delivered across the United States and Canada. See Harrison, supra at p. 8, 862 So.2d at 1070. Both the insurer and the named insured are or were Belgian entities, while Champion is an entity organized under the laws of a state other than Louisiana.
*172 We can come to no other conclusion but that, based on Louisiana's choice-of-law provisions and prior jurisprudence, Belgian law should be applied to the insurance contract at issue. We also find that the parties, both Belgian citizens, intended that the insurance contract be interpreted pursuant to Belgian law. A contrary conclusion could subject this policy to 50 different interpretations based on the state in which a plaintiff files suit, thereby destroying any predictability or uniformity of application. Thus, we find that the trial court erred by applying Louisiana.
We now consider whether, under Belgian law, the insurance policy issued by AXA to Eternit will provide coverage for the injury suffered by Mr. Murden, that being asbestosis. Based on its interpretation of the policy, AXA contends that under Belgian law (1) asbestosis cannot be considered an "accident" within the language of the policy; (2) this is a claims-made policy and the claim submitted by Champion was well outside the term of the contract; and (3) the claim submitted by Champion against it was untimely because the insured was required to bring action against it within six months from the notice of its refusal to intervene in the loss.
In order to inform the court of Belgian law, the parties each filed into the record an affidavit from a Belgian attorney to explain Belgian law and interpret the policy in accordance with that law. It is not surprising that the two attorneys, both of whom appear imminently qualified to render coverage opinions, have arrived at contrary conclusions. We have also read the policy itself and have made our own judgments based on its plain language.
AXA's expert, Philippe Colle, is an attorney who specializes in Belgian insurance law and has authored books and articles on the subject. He stated that the policy uses the term "accidental damage," and, therefore, a condition of coverage under the policy is that the damage be caused by an "accident," as that term is identified in Belgian law. He explained that under Belgian jurisprudence, three conditions must be met in order to qualify as an "accident": the damage must be the consequence of (1) a sudden, (2) unforeseen, and (3) an abnormal fact. He stated that an "accident" in the insurance liability context has also been defined as "a sudden and abnormal event that is directly and solely caused by the sudden effect of an external cause." Thus, his opinion was that "accidental damage" would not include a disease like asbestosis that is contracted as a result of prolonged exposure to asbestos-containing products.
Mr. Colle also was asked to render an opinion on the time within which claims must be made under the policy. After reviewing the language of the policy, specifically, Article I, paragraphs 6 and 7, he concluded that only claims made during the coverage period were covered. Thus, in order to be covered, all claims had to be made no later than 31 December 1979, the date the policy was terminated. He based this interpretation on the word "sinistres," as that term appears in those paragraphs. He stated that under Belgian law, "sinistres" are the materialization or realization of the insured risk. He explained that the purpose of liability insurance is to cover the insured against liability claims that are covered under the policy, thus the risk presupposes that a claim has actually been made.
Finally, Mr. Colle relied on Article 20 of the General Conditions of the policy that states:
The insured is foreclosed from recourse against the Company should he neglect to bring action against it within six months from the notice of its refusal to intervene in a loss.
*173 Because Champion's judicial demand of 31 October 2002 came more than six months after AXA refused coverage by letter dated 31 March 1994, Mr. Colle stated that Champion had no right to claim coverage under the policy.
Champion presented the affidavit of Stefaan Cnudde, a Belgian attorney who worked in the field of liability insurance at Royale Belge (now AXA Belgium) and now specializes in international private and public law, with a particular emphasis in commercial law and dispute resolution.
Mr. Cnudde began by quoting article 1156 of the Belgian Civil Code that provides:
With respect to agreements, one has to look for the common intent of the parties rather than sticking to the literal meaning of the language used.
He pointed out that the policy in question was to provide "comprehensive products liability insurance."
Mr. Cnudde disagreed with Mr. Colle's interpretation of the word "accidental," stating that most policies require that damages be caused accidentally and exclude coverage for damages that have not have been caused by chance. In other words, the causation of the damage and the damage itself must be unintended and unpremeditated. He did not find that the policy required that the injuries and/or damages be caused by an "accident" in the sense of a sudden event, stating that the word "accidental" is not synonymous with the word "sudden."
Mr. Cnudde commented that if the insurer had intended to restrict coverage to "accidents" in the sense of sudden events, it would have been expressly stated in the policy, as was common practice for such policies. The only exclusion contained in the policy was for damage accidentally caused to third parties as the result of willful misconduct, malevolence, or fraud on the part of the subscriber or its employees.
It was also Mr. Cnudde's opinion that the policy in question provides coverage that is occurrence-based as opposed to claims-made based. After examining the language of the policy, he said that it provided coverage against liability arising out of acts or omissions of the insured or of a defect of its products during the policy period, no matter when a claim is made. He further stated, relying on and quoting Belgian doctrine:
The issue of extent of coverage in time is also associated with the fact that, with respect to liability insurances, the loss is a phenomenon of which the realization may be subject to a continuance in time.
The insurance contract is concluded for a definite period. The loss itself takes some time to fully develop. The process of the loss may be accomplished within the time period of the contract, in which case the coverage is unquestionably acquired. But it also happens that the process already started at the date of effect of the contract, especially when the "generating event" took place earlier; this is the issue of "anteriority risk." The contrary is also possible, especially when the `claim' of the victim is made after the end date of the contract; this is the issue of "posterior risk." Such situations are more frequent when the contracts are of short duration....
In the past, the law didn't provide any solution. The answer to the question often depended on a delicate interpretation of the terms of the contract. But gradually, the insurers became aware of the problem and the policies started to address it somehow by being more or less precise. The most restrictive solution was not to accept *174 losses of which both characteristics, namely the "generating event" and the "claim" of the victim did not occur during the coverage period. But extensions were sometimes provided. The coverage of the "anteriority risk" accepted, under certain conditions, claims that were made during the contract period with respective to generative events that occurred before that period. The coverage of the "posterior risk," inversely, accepted claims that were made after the end of the contract but which dealt with generative events that occurred during the coverage period.
Mr. Cnudde could find no language in the policy that excluded a "posterior risk" such as the asbestosis suffered by Mr. Murden.
Finally, Mr. Cnudde addressed the issue of whether Champion's notice of 31 October 2002 to AXA was untimely. Article 20 of the General Conditions of the policy, relied upon by AXA is found in that part of the policy that deals with the "civil liability insurance for work risks of industrial and commercial companies." Thus, he opined that article 20 of the General Conditions, imposing a six-month time limitation, is not applicable to the present case.[3]
We have read the policy language itself and arrive at the same conclusion as Mr. Cnudde with regard to the use of the words "[b]odily injuries and/or damage to property accidentally caused to third parties[.]" The words, as written, indicate that the injuries and/or damage must be unintentional and not premeditated or purposeful. This conclusion is bolstered by the fact that the policy specifically excludes "cases of willful misconduct or fraud established on the part of the Subscriber itself[.]" If AXA had meant to cover only sudden occurrences, then words to that effect should have been included in the policy.
Finally, being a comprehensive products liability policy, we assume that the parties intended coverage for all risks associated with asbestos-containing products. The parties entered into the contract in 1974, and by that time, asbestosis was a known risk of repeated exposure to asbestos.[4] The parties should have been aware of that fact in 1974, especially Eternit as the manufacturer of the products. Therefore, AXA should have specifically excluded coverage for asbestosis and other latent diseases *175 in the policy itself if that had been its intention.
Therefore, applying Belgian law, we find that the policy issued by AXA to Eternit and Champion provides coverage for the injuries sustained by Mr. Murden. Consequently, the judgment of the trial court is affirmed and the writ filed by AXA is denied.
JUDGMENT AFFIRMED; WRIT DENIED.
ARMSTRONG, C.J., concurs.
NOTES
[1] Both AXA and Champion filed motions for partial summary judgment on the issue of whether the insurance policy issued by AXA would provide coverage for the personal injuries sustained by John Murden in the underlying action. The motions were heard on 19 October 2004, and, on 10 November 2004, the trial court signed a judgment in favor of Champion finding coverage and denied AXA's motion. The judgment in favor of Champion was certified as a final judgment pursuant to La. C.C.P. art. 1915. AXA timely filed a writ application from the denial of its motion for summary judgment and requested that the court postpone consideration of it until the parties had filed briefs on AXA's planned appeal from the granting of Champion's motion. The two actions were subsequently consolidated by court order on 20 April 2005.
[2] The policy was drafted in French, but a certified translation into English was filed into the record.
[3] In addition, Mr. Cnudde was unaware of any "notice of refusal to intervene" from AXA to Champion, noting that two of the notices in question were sent to the broker of Eternit and to Eternit itself, but not to Champion. Further, because the plaintiffs did not file their suit against Champion until 1999, the notice of 31 March 1994 sent by AXA to Champion could not possibly be related to the present case.
[4] The court in Borel v. Fibreboard Paper Products Corp., 493 F.2d 1076, 1083-84 (5th Cir. 1973), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974) stated:

Asbestosis has been recognized as a disease for well over fifty years. The first reported cases of asbestosis were among asbestos textile workers. In 1924, Cooke in England discovered a case of asbestosis in a person who had spent twenty years weaving asbestos textile products. In the next decade, numerous similar cases were observed and discussed in medical journals. An investigation of the problem among textile factory workers was undertaken in Great Britain in 1928 and 1929. In the United States, the first official claim for compensation associated with asbestos was in 1927. By the mid-1930's [sic], the hazard of asbestosis as a pneumoconiotic dust was universally accepted. Cases of asbestosis in insulation workers were reported in this country as early as 1934. The U.S. Public Health Service fully documented the significant risk involved in asbestos textile factories in a report by Dreessen et al., in 1938. The authors urged precautionary measures and urged elimination of hazardous exposures. [Citations omitted.]